**In re SECOND PENNSYLVANIA REAL ESTATE CORPORATION, Debtor.**

**The COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS, The Estate Representatives of Papercraft Corporation, Plaintiffs,**

v.

**SABLE, MAKOROFF & GUSKY, P.C., First Pennsylvania Funding Company, Inc. and Second Pennsylvania Real Estate Corporation, Defendants.**

Bankruptcy No. 92–25302 JLC.
Adversary No. 92–2299.

United States Bankruptcy Court,
W.D. Pennsylvania.

Nov. 2, 1995.

Stephen J. Laidhold, Robert G. Sable, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for Sable, Makoroff & Gusky, P.C./Second Pennsylvania Real Estate Corp.

David A. Murdoch, Kirkpartick & Lockhart, Pittsburgh, PA, for First Pennsylvania Funding Co., Inc.

Philip E. Beard, II, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, PA, for Committee of Creditors Holding Unsecured Claims, the Estate Representatives of Papercraft Corp.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Bankruptcy Judge.

The matter before the court is a complaint to interplead funds which are subject to competing claims of entitlement between Sable, Makoroff & Gusky, P.C., as counsel for Second Pennsylvania Real Estate Corporation, and First Pennsylvania Funding Company, Inc. The funds in the amount of $400,000 have been paid into the court registry by Papercraft Corporation pursuant to a Settlement Agreement in its bankruptcy at Case No. 91–903. For the reasons expressed below, this court holds that Sable, Makoroff & Gusky, P.C. is entitled to payment of its fees in the amount requested at trial from the funds presently held in the court registry.

### Facts

In May of 1988, Papercraft Corporation ("Papercraft") sold a warehouse facility and office complex located in O'Hara Township known as Papercraft Park to Second Penn-

sylvania Real Estate Corporation ("Second PA"). The transaction was a lease/purchase arrangement in which Papercraft leased back a portion of the building from Second PA for a fifteen year term. The funding for the acquisition was accomplished through the establishment of a corporate entity known as First Pennsylvania Funding Company, Inc. ("First Funding"). First Funding loaned Second PA approximately $15.3 million dollars. As security for repayment of the debt, Second PA executed a Purchase Money Mortgage, Mortgage Note, Security Agreement, Assignment of Leases, UCC–1 financing statements and other documents in favor of First Funding.

On March 22, 1991, Papercraft filed a voluntary Chapter 11 bankruptcy petition. Papercraft was represented in the bankruptcy proceeding by Kirkpatrick & Lockhart. As landlord of Papercraft, Second PA was an interested party in the Papercraft bankruptcy. At the inception of the case, settlement discussions took place between Papercraft, Second PA and the Creditors' Committee of Papercraft. The initial offer of settlement at that time was $432,000. The offer was unacceptable to Second PA and thereafter litigation regarding all aspects of the case ensued. During the administration of the case, a motion to reject the lease and numerous other matters were zealously litigated by the parties. During the period of protracted litigation, Sable Makoroff & Gusky, P.C. ("SM & G") incurred fees of which approximately $117,000 remain unpaid. A settlement was ultimately reached pursuant to which Papercraft would pay to Second PA the sum of $825,000 in two installments. The first installment of $425,000 was paid as provided in the settlement. The second installment of $400,000 that is the subject of this interpleader action has been paid to the bankruptcy court's registry pending the resolution of this case. In addition to the $825,000, Papercraft agreed to provide up to $300,000 in remediation costs for environmental cleanup at Papercraft Park and to relinquish a claim it had previously made to monies being held in escrow in the amount of $50,000. Further, Second PA was to be released from obligations pertaining to a note in the amount of $1,150,000.

As a result of Papercraft's bankruptcy and rejection of the Second PA lease, Second PA was unable to meet its financial obligations to First Funding. After confirmation of the Papercraft plan, First Funding commenced foreclosure proceedings against Second PA seeking payment of the rents and monies due pursuant to the Mortgage and Assignment regarding Papercraft Park. The Court of Common Pleas of Allegheny County, PA ordered that all rents and other payments regarding Papercraft Park were to be paid to First Funding. Subsequently, Second PA filed its own Chapter 11 bankruptcy.

In May of 1993, First Funding was granted relief from stay to foreclose on its interest in Papercraft Park. First Funding purchased Papercraft Park at a sheriff's sale conducted in September of 1993 by bidding in its claim.

SM & G asserts that it is entitled to a portion of the funds for its remaining unpaid fees on the theory that its efforts created the settlement fund, that the fund directly benefitted First Funding and therefore it is entitled to receive payment from this "common fund".

First Funding filed a motion for summary judgment on the issue of entitlement to the fund. That motion was denied and an evidentiary hearing was held.

In its dispute with Second PA, First Funding has been represented by Kirkpatrick & Lockhart. Kirkpatrick & Lockhart also represented Papercraft in its bankruptcy.

*Analysis*

SM & G asserts initially that it is entitled to receive payment from the settlement proceeds for its legal fees related to the creation of the settlement fund on the basis of a common fund theory. It contends that its efforts created the fund and that the fund benefitted others aside from its client and, in particular, directly benefitted First Funding. A common fund was, therefore, created from which SM & G argues it is entitled to payment. Alternatively, it argues that it has an equitable charging lien on the monies.

SM & G contends that the creation of the fund was a result of its efforts evidenced by

the fact that the settlement offer grew from $432,000 at the beginning of the case to the substantially higher amount. These efforts included the filing of motions seeking payment of administrative rent, objecting to the rejection of the lease, engaging in discovery, appeals, filing a motion to reconstitute the Creditors' Committee, a motion to appoint an examiner based on alleged improper claims trafficking, a complaint to compel resumption of environmental remediation, a complaint seeking an injunction against Papercraft, and objections to various fee petitions.

Because First Funding had a secured interest in the assets of Second PA, SM & G contends that First Funding had a strong economic interest in the outcome of the dispute between Second PA and Papercraft. Further, SM & G asserts that First Funding was aware of and approved the litigation efforts of SM & G.

First Funding disputes SM & G's entitlement to payment from the fund and contends that SM & G's legal fees cannot take precedence over their prior perfected security interest. It argues that SM & G knew of the security interest and did not seek a carve out. Therefore, to allow their payment would be inequitable. First Funding also argues that SM & G did not meet the requirements for an equitable charging lien and that its "common fund" theory is inapplicable.

*Common Fund Doctrine*

■ The common fund doctrine was recognized by the Supreme Court in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (citations omitted) as providing that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The common fund doctrine is an exception to the general principle of the American Rule which requires litigants to bear their own attorney's fees.

■ The common fund doctrine is rooted in the principle that those who would obtain a benefit from litigation without contributing to the cost would be unjustly enriched. Courts that have jurisdiction over the fund created by the litigation can prevent unjust enrichment by allocating fees from the fund. It is designed to spread the costs proportionately so that the active beneficiary does not bear the whole burden while the "stranger" beneficiaries receive benefits without bearing any of the costs. *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 769 (9th Cir.1977).

■ Generally, the common fund doctrine is considered applicable when: "(1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced, and (3) the fee can be shifted with some exactitude to those benefitting." *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 271 (9th Cir.1989) *citing Petition of Hill,* 775 F.2d 1037 (9th Cir.1985).

In Pennsylvania, the common fund concept is incorporated into the state statute at 42 Pa.C.S.A. § 2503(8) which provides that:

> The following participants shall be entitled to a reasonable counsel fee as part of the taxable cost of the matter:
>
> (8) Any participant who is awarded counsel fees out of a fund within the jurisdiction of the court pursuant to any general rule relating to an award of counsel fees from a fund within the jurisdiction of the court.

Participants are defined in 42 Pa.C.S.A. § 102 as litigants, witnesses and their counsel. In addition to the codification of the common fund doctrine, Pennsylvania case law also supports the "common fund" concept. In *Couy v. Nardei Enterprises,* 402 Pa.Super. 468, 587 A.2d 345 (1991), the Superior Court of Pennsylvania applied the common fund doctrine in a case involving a partnership where limited partners and the general partner benefitted from litigation which resulted in the creation of a fund. In *Couy,* the limited partners were awarded a $106,000 judgment against the managing partner for improperly using partnership funds. The funds were paid to the partnership. The partners paid their respective counsel fees and then sought reimbursement from the common fund. The Superior Court of Pennsylvania upheld the Common Pleas Court decision to allow the partners reimbursement for the fair and reasonable coun-

sel fees. It found that the partnership gained a benefit from the litigation and the plaintiffs held a less than 50% interest in the partnership, thus, providing a benefit to other limited partners and the general partner.

■ First Funding relies upon the case of *Recht v. Urban Redevelopment Authority of City of Clairton*, 402 Pa. 599, 168 A.2d 134 (1961). In *Recht*, the court reviewed a number of cases in which attorneys sought to be paid as a result of an equitable charging lien. A charging lien is established under Pennsylvania law when it is shown:

> (1) there is a fund in court or otherwise applicable for distribution on equitable principles; (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid; (3) that it was agreed that counsel look to the fund rather than the client for compensation; (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

*Id.* at 138–39.

*Recht* is distinguishable in several respects. First, *Recht* dealt with the issue of an attorney's "charging lien" which SM & G is not asserting as its primary theory. Second, the attorney in *Recht* attempted to assert a charging lien on a fund created upon an appeal in which the attorney did not participate.

■ In the instant case, the factors generally considered in a common fund case are present. The class of beneficiaries is easily identifiable: Second PA as mortgagor of Papercraft Park and First Funding as mortgagee and as holder of a security interest in proceeds of litigation received by Second PA. Second, the benefits can be accurately traced. The funds were created by the efforts of SM & G in its strenuous pursuit of various actions in the Papercraft bankruptcy as more fully described below. Further, the fee can be "shifted" with some exactitude. The benefitting party is a single entity rather than a large class. It is not difficult to

determine the appropriate burden in this case.

While many cases that apply the common fund doctrine are class action cases, there has been no authority cited to the court which suggests that the doctrine must be applied exclusively in such cases. In fact, case law suggests to the contrary. *See, e.g., Couy v. Nardei Enterprises, supra*. Based on the above, the application of the common fund doctrine in the present case is appropriate.

*Creation of the Common Fund*

■ The testimony at trial on behalf of SM & G consisted of the witness testimony of Robert G. Sable, Esq. ("Sable"). Sable testified that the original settlement offer early in the case was $432,000 and after a number of hotly contested matters in which Second PA pursued various positions in opposition to Papercraft, the settlement offer eventually increased to a substantially higher amount. In addition, Sable testified that the plan originally called for creditors to receive unregistered securities of Papercraft as payment for their debt. This form of payment was unacceptable to Second PA. In order to make the monthly payment to First Funding, Second PA needed cash. Unregistered securities were not easily marketable or converted into cash. Through the efforts of SM & G, Second PA achieved a different result than other creditors and was able to negotiate a settlement involving cash.

Testimony showed that SM & G undertook numerous positions which challenged Papercraft and ultimately lead to a higher settlement. SM & G rendered the following services over the course of less than a year's time: motion to pay administrative rent; objection to motion to reject lease; motion to dismiss for bad faith which had related discovery and appeals; motion to reconstitute the Creditors' Committee; motion to appoint an examiner as a result of the claims trafficking; complaint to compel the resumption of environmental remediation which Papercraft had ceased upon filing the petition; complaint for preliminary injunction to prevent litigation concerning the collection of a note with Second PA; objections to fee applications of certain professionals; defense of ob-

jection to Second PA's proofs of claim; objection to Papercraft's disclosure statement; and negotiation of the final settlement.

Sable testified that the work effort of SM & G was directly responsible for the creation of the $825,000 which was paid to Second PA as well as the $300,000 remediation fund. (Tr. at p. 51.)

Sable's testimony established that First Funding benefitted from the results of SM & G's efforts:

> ... virtually every nickel that's come out of this fund, to date, has gone to First Pennsylvania. And, they, as a result of the settlement of the other litigation, the first $425,000 was received by First Pennsylvania. First Pennsylvania now owns the property, so they receive the entire benefit of the environmental remediation fund. So, they've already received over three quarters of a million dollars.

(Tr. at pp. 76–77.)

The court finds that the testimony at trial supports the conclusion that the efforts of SM & G created the settlement fund.

*Priority of Distribution of Proceeds*

■ First Funding emphasizes that the lack of an agreement between the parties is fatal to SM & G's argument for an equitable lien. Any agreement would have been between Second PA and First Funding. First Funding suggests that SM & G was required to seek an agreement with it in order to carve out its fees from the security interest that it held. Sable's testimony showed that First Funding was aware of the litigation efforts and kept informed of the status by Second PA. (Tr. at pp. 58–60.) However, keeping First Funding aware is not the same as entering into an agreement concerning fees.

Courts have held that attorneys who have created funds are entitled to receive payment from those funds even though creditors hold secured interests in the funds created. In an older yet applicable case of *Appeal of Harris,* 323 Pa. 124, 186 A. 92 (1936), the Pennsylvania Supreme Court decided the issue of whether the attorney for an insolvent owner of real estate taken in a condemnation proceeding, had a claim for the reasonable value of his services ahead of a mortgagee of the property where the attorney created the fund and the mortgagee did not participate in the condemnation process. In determining that the attorney did have a right to reasonable compensation from the amount received by the owner for condemnation, ahead of the mortgagee, the court stated:

> We will go farther and say that even where a lien creditor, such as the mortgagee in the case before us, has a claim upon the property superior to the owner's, yet, if his interest in the fund created, which the owner is primarily entitled to collect, is substantially identical with that of the owner, and the fund is realized solely through the efforts of the owner's attorney, who agrees to look to the fund for his compensation, the lien creditor must yield his claim to the attorney's reasonable claim for compensation and must yield his claim also to the payment of the legal costs.

186 A. at 97.

In addition to the *Appeal of Harris, supra,* the *Recht* court reviewed a number of cases in which fees were sought. Among those was *Appeal of Atkinson,* 11 A. 239 (Pa.1887) in which the court, after noting that the attorney had not received a retainer and agreed to be paid from the fund, stated "[u]nder this state of facts, the court having control of the funds, could not, on any principles of equity, turn all the money over to the plaintiff, and compel the attorney to resort to a suit against an insolvent client for the collection of his fees." *Id.* at 241. The court further stated that "an attaching creditor occupies no higher position than his debtor". *Id.*

This court has previously found that the security interest held by First Funding in Second PA's assets, which covered rents as well as other sums of money related to Papercraft Park, "including causes of action", applied to the $400,000 at issue. *First Pennsylvania Funding Co. Inc. v. Sable Makoroff & Gusky, P.C., Second Pennsylvania Real Estate Corp.,* slip. op. at pp. 11–12. (Bankr. W.D.Pa. Feb. 22, 1994). First Funding clearly stood to benefit from any sums received in settlement or in adversarial proceedings with Papercraft.

The financial agreement between First Funding and Second PA was not in the nature of the typical standard mortgage. Pursuant to the loan agreement, Second PA was to pay First Funding a monthly payment equal to a percentage rate of interest. After that, Second PA was paid a management fee, then revenues after operating expenses were split between the two entities. The operating expenses were based upon a monthly budget submitted by Second PA to First Funding. In addition, upon a sale of the facility, First Funding was to receive half of any profit over and above the original loan amount. Thus, the lending facility had provisions that varied from the typical mortgage and required a level of interaction between First Funding and Second PA well beyond that of a mortgagor/mortgagee.

As a result of this loan arrangement, and with the same attorneys as Papercraft, First Funding was aware of Second PA's litigation with Papercraft. Sable testified that during the pendency of the Papercraft bankruptcy, at least one meeting was held with First Funding to advise of the status of pending litigation. (Tr. at p. 54.) SM & G also contends that, pursuant to the monthly budget statements required by the loan documents, First Funding was aware that litigation was ongoing and that SM & G had been receiving disbursements from Second PA for these efforts. First Funding failed to object to such disbursements.

Testimony at trial showed that First Funding was provided a monthly summary of disbursements which reported payments being made to SM & G. This testimony did not clearly show that First Funding was in a position to deny direct approval of Second PA's disbursements before the expenditures were made.

First Funding was intricately involved in the Papercraft Park project for several years before the filing of the Papercraft bankruptcy. As a result of its involvement, it was aware that Papercraft was a major tenant in the complex and, further, that it would be difficult upon the loss of the lease with Pa-

percraft to find new tenants quickly. In addition, First Funding was aware that the treatment received by Second PA in the Papercraft bankruptcy would have important economic consequences for First Funding.

More importantly, the same law firm that represented Papercraft in its bankruptcy represented First Funding. First Funding was established to fund the acquisition of the Papercraft complex by Second PA. It provided the funds to Second PA and held a mortgage on the property. Papercraft then leased back the premises from Second PA. Upon the lease rejection by Papercraft, Second PA was not able to meet its obligations to First Funding. First Funding then foreclosed upon Second PA and Second PA subsequently filed its own bankruptcy.

First Funding was aware that Second PA was pursuing lease rejection litigation and expending considerable efforts throughout the Papercraft bankruptcy.

Under all the circumstances, the representation by Kirkpatrick & Lockhart of both Papercraft as a debtor and First Funding as a creditor is disquieting. It comes with poor grace for First Funding to complain of the payment of Second PA's fees for litigation efforts of which it was aware and directly stood to benefit.

SM & G's request for relief appears to be analogous to a creditor of a debtor seeking payment pursuant to a claim under 11 U.S.C. § 506(c).[1] The issue of a § 506(c) claim was raised in the arguments concerning the motion for summary judgment but was not raised at trial or in the post-trial briefs. The circumstance is not unlike that of a party seeking to recover its reasonable and necessary costs from a secured asset where it has been instrumental in the preservation or disposition of such asset. A claimant under § 506(c) in the Third Circuit must show: "(1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors." *In re C.S. Assoc.*, 29 F.3d 903, 906 (3d Cir.1994),

---

**1.** Section 506(c) provides that a "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

citing *Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80, 84, 86–87 (3d Cir.1989) and *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94–95 (3d Cir.1986). In the instant case, the expenditure did more than preserve or dispose of an asset; rather, it created an asset. The second prong of the test has been met as First Funding clearly benefitted by the additional sums of money received. Further, Second PA was the only party to pursue various aspects of litigation and a more favorable settlement because First Funding, at the time of the Papercraft bankruptcy filing, was not a creditor of Papercraft.

The better course of action by Second PA in this situation would have been to approach First Funding, advise that its legal efforts were creating an asset in which First Funding was benefitting and to enter into an agreement concerning fees. Keeping First Funding informed was not the equivalent of obtaining an agreement. Nevertheless, without the work of Second PA a smaller asset would have existed for First Funding's security interest to attach.

To allow the funds generated by the work efforts of SM & G to be paid to First Funding, the beneficiary, while leaving SM & G to look to an insolvent client for payment of its fees, would be unjustly enriching First Funding at the expense of SM & G, not Second PA. The purpose of the common fund doctrine is to prevent such unjust enrichment. *Boeing Co. v. Van Gemert*, 444 U.S. at 477–79, 100 S.Ct. at 749. The equities of this case compel the award of SM & G's fees from the interpleaded fund.

*Amount of Fees*

█ SM & G has requested $117,760.59 in fees in connection with the creation of the fund. It contends the amount of fees is reasonable. The court does not find the amount of fees to be unreasonable in light of the effort expended and result achieved. Further, in the Report of the Third Circuit Task Force on Court Awarded Attorney Fees, it was recommended that:

... in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel.

Court Awarded Attorney Fees, Report of the Third Circuit Task Force, October 8, 1985, 108 F.R.D. 237, 255.

If this court were to consider the matter from a percentage basis on the net amount of fees requested, the amount requested would be approximately 17 per cent.[2] The percentage appears to be a reasonable one in light of the facts of this case.

*Conclusion*

For the reasons expressed above, the requirements of common fund have been met in this case. Further, although the common fund doctrine is not routinely applied, the facts and equities present make it application appropriate in this case. SM & G is entitled to receive payment of its fees requested at trial that specifically relate to the creation of the fund, $117,760.59, from the interpleaded fund.

The Clerk is holding $400,000. First Funding has a secured interest in the balance of the funds and, therefore, distribution of the remaining funds after payment to SM & G shall be made to First Funding.

An appropriate order shall issue.

### ORDER OF COURT

**AND NOW,** this 2nd day of **November, 1995,** for the reasons expressed in the Memorandum Opinion of even date, it is hereby **ORDERED** that Sable Makoroff & Gusky, P.C. is allowed the requested fee amount of $117,760.59 for services rendered in connection with the creation of the interpleaded fund presently being held in the registry of the court.

It Is Further **ORDERED** that the allowed sum shall be paid to Sable Makoroff &

---

**2.** The total amount of the fund benefitting First Funding was approximately $1,125,000 ($400,00 payment, $425,000 payment and $300,000 remediation) minus the $432,000 offer of settlement made early in the case for a net amount of $693,000. The amount requested is $117,760.59.

Gusky, P.C. from the interpleaded sum presently being held in the registry of the court. The Clerk shall issue a check made payable to Sable, Makoroff & Gusky, P.C. in the amount of $117,760.59 from said fund no sooner than ten days from the date of this order.

It Is Further **ORDERED** that the Clerk shall issue a check made payable to First Pennsylvania Funding Company, Inc. for the balance of the fund after payment to Sable, Makoroff & Gusky, P.C.