**In re INDEPENDENT PIER COMPANY, Debtor.**

**Bankruptcy No. 96–12038 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 27, 1997.

John A. Wetzel, Swartz, Campbell & Detweiler, Philadelphia, PA, for debtor.

Christopher D. Loizides, Arthur Newbold, Martin J. Black, Dechert, Price & Rhoads, Philadelphia, PA.

Walter Weir, Jr., Weir & Partners, Philadelphia, PA.

Bruce Grohsgal, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, PA.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

*Introduction.*

Pending before the Court are two related matters, both of which arise in turn from yet a third matter, which although resolved, must itself be reviewed in some detail given its bearing on the instant issues. The first matter is the request of Gilbert B. Abramson, Esquire ("Abramson") for approval of an Application entitled *Application of Special Counsel for Debtor for Allowance of Compensation in Accordance with this Court's Order of May 10, 1996.* This request is objected to by the Official Committee of Unsecured Creditors. (The "Committee"). The second matter is the objection of the Chapter 11 Debtor, Independent Pier Company ("IPCO") and the Committee to the Amended Proof of Claim filed by the Dechert Price & Rhoads law firm. ("Dechert"). For the reasons hereinafter discussed, the special counsel fee application will be approved and the objection to the Dechert proof of claim will be sustained.

*Background.*

The background to the instant dispute is somewhat complex and goes back several years, though many of the relevant facts are not in dispute. From 1974 through 1990 IPCO leased Pier 80 South at the Port of Philadelphia from the Philadelphia Port Corporation and operated a paper stevedoring business at that location. At some point in 1990, the Philadelphia Port Corporation apparently notified IPCO that it would not renew the parties' lease and demanded that IPCO vacate Pier 80. IPCO engaged Dechert to assist it in resisting the Port Authority and it is agreed that Dechert thereafter undertook litigation on several fronts. Dechert's steps included the initiation of an action in the Philadelphia Court of Common Pleas entitled *Independent Pier Company v. J.H. Stevedoring Company, and Jack Reimer, and Philadelphia Port Corporation, and Philadelphia Regional Port Authority,* Philadelphia CCP No. 3744, May Term, 1990. (Exhibit "D-2"). This Common Pleas Court action sought various forms of injunctive relief and money damages against the governmental entity defendants, against Reimer, a former employee of IPCO, and against J.H. Stevedoring the rival company which Reimer had apparently formed to compete with IPCO. A separate action was simultaneously instituted before the Federal Maritime Commission in Washington D.C. as was a separate injunction action in the U.S. District Court for the Eastern District of Pennsylvania. These litigations were subsequently settled as to the municipal agencies (see Exhibit A–I), and by April 1992 the only matters still extant were the monetary claims against IPCO's former employee Jack Reimer, and his Company, J.H. Stevedoring Company.

There is no dispute that at or about this time, IPCO and its attorneys developed concerns that certain potential defendants, in particular those believed to have the deepest pockets, had been omitted from the Common Pleas Court action. They sought to rectify that situation by commencing an action against such persons, first via a writ of summons, but later through the filing of a second complaint in the Court of Common Pleas entitled *Independent Pier Company v. J.H. Stevedoring Company, Penn Trucking & Warehousing, Inc., Jack Reimer, John M. Brown, Sr., and John M. Brown, Jr.,* Philadelphia CCP No. 3510, February Term, 1992 (Exhibit D–4). This action, which supplanted

the original Common Pleas Court action, deleted the governmental entities, but sought money damages for a now expanded series of torts alleged on the part of the remaining defendants, all of which still arose out of the series of events which had occurred in 1990.

The torrid pace of litigation subsided substantially after consummation of the settlement between IPCO and the governmental entities, while the issue of Dechert's large, and largely unpaid, cumulative bill for legal services came to take on an increasingly prominent role. By early to mid 1993, the situation according to Dechert partner, Fred Magaziner, Esquire, had become "intolerable." This led Dechert to enlist Abramson as an attorney willing to assume IPCO's representation in the pending Common Pleas Court action on a contingent basis. Abramson negotiated his fee directly with IPCO and initially struck with the Company what the parties have characterized as a modified contingent fee agreement. (See Exhibit "A" to Exhibit D–8). The Agreement called for certain non refundable retainer payments to be later applied against a one-third contingency fee in the event of a monetary recovery on the part of IPCO.

The three parties, IPCO, Abramson, and Dechert, thereafter executed an agreement, prepared by Dechert, the disputed terms of which are central to the matters *sub judice,* (Exhibit D–5). The text of the parties' relatively brief agreement is as follows:

This is an agreement among Independent Pier Company ("IPCO"), Dechert Price & Rhoads ("Dechert") and Gilbert Abramson, Esquire ("Abramson").

1. Dechert has been rendering legal services to IPCO since 1990 in connection with a dispute involving, among others, Pier 80 South, J.H. Stevedoring and Company, Penn Trucking Company, and various members of the Brown family (hereinafter "The Pier 80 Litigation").

2. As of July 15, 1993, Independent Pier owed Dechert $216,049.03 for Dechert's work in The Pier 80 Litigation. In addition, Dechert has recorded a total of $10,464.80 ($9,317.50 in time and $1,147.30 in costs) for The Pier 80 Litigation that has not yet been billed to IPCO. Thus, the total that IPCO owes Dechert is $226,513.83.

3. Abramson will take over the representation of IPCO in The Pier 80 Litigation. Dechert will provide to Abramson its complete file on the matter.

4. Dechert will have not further involvement in The Pier 80 Litigation except if Abramson calls on Dechert for advice or assistance from time to time and Dechert, in its sole discretion, decides to provide such advice or assistance to Abramson. It is Dechert's present expectation that it will assist Abramson when asked.

5. In lieu of now paying Dechert the $226,513.83 that it owes to Dechert, IPCO hereby agrees to pay Dechert in accordance with paragraphs 6 and 7 below.

6. If IPCO's share of any settlement or judgment is $226,513.83 or less, then all of IPCO's share shall be paid to Dechert. "IPCO's share" shall mean that portion of any settlement or judgment that belongs to IPCO; "IPCO's share" shall not include that portion of any settlement or judgment that belongs to Abramson under any contingent fee agreement between Abramson and IPCO.

7. If IPCO's share of any settlement or judgment exceeds $226,513.83, then $226,513.83 shall be paid to Dechert and the remainder shall belong to IPCO.

8. IPCO hereby authorizes Abramson to pay Dechert, in accordance with paragraphs 5–7, out of the proceeds of any settlement or judgment, and Abramson agrees that he will pay Dechert in accordance with paragraphs 5–7 out of the proceeds of any settlement or judgment.

9. No party to this Agreement shall assign his or its rights or obligations under this Agreement.

Abramson's contingent fee agreement was later modified in a letter agreement with IPCO to delete one of two required retainer

payments in exchange, basically, for an increase of his firm's contingency fee from ⅓ to 40%. (Exhibit B to Exhibit D–8).

The 1992 Common Pleas Court Litigation continued thereafter with Abramson at the helm. IPCO's fortunes, however, deteriorated and on March 8, 1996, it commenced the instant Chapter 11 case. Trial of the Common Pleas Court action was by then scheduled for May of 1996. In April, 1996, therefore, IPCO filed an application for permission to retain Abramson as special counsel for the purpose of continuing his representation of IPCO in the pending lawsuit. This application was approved, as unopposed, by Order dated May 10, 1996. The Order entered authorized IPCO to retain Abramson on the same terms as it had prior to the commencement of its Bankruptcy case. Significantly, no mention of the tri-party agreement between IPCO, Abramson and Dechert was made in the application to retain special counsel, nor for that matter was Dechert, or its claim for unpaid legal fees, even listed by the Debtor in its matrix or bankruptcy schedules.

Not long afterward, IPCO and the Common Pleas Court Defendants reached a settlement of their differences. The settlement called for an aggregate payment of 1.1 million dollars to IPCO. On July 22, 1996, IPCO filed a motion to approve the foregoing compromise of its claim under Bankruptcy Rule 9019, and on July 26, 1996, Abramson filed the above referenced *Application of special counsel for Debtor for allowance of compensation in accordance with this Court's Order of May 10, 1996.* Abramson's application requests a legal fee of $400,000.00 plus costs of $10,777.25, a total sum slightly less than that which would be calculable under the terms of his modified agreement with IPCO. Dechert filed a written response to the compromise motion which did not object to the terms of the proposed settlement, but did object to distribution of the proceeds without payment of its claim. The Committee which also supported the settlement, in turn, filed an objection to Abramson's fee application, noting the non-disclosure of any prior claim by Dechert to a share of the litigation fund, and arguing that the *total* legal fee allowed in

the matter should not exceed the 40% "cap" set forth in the Debtor's original pleading to retain special counsel. A hearing on the proposed settlement of the pending lawsuit was held on October 7, 1996. At the conclusion of this hearing, the Court, at the behest of or with the acquiescence of all parties in attendance, approved the 1.1 million dollar settlement between IPCO and the Common Pleas Court Defendants. The Court also approved a Stipulation between the Committee, Dechert, Abramson, and the Debtor which authorized the immediate disbursement to Abramson of a legal fee of $213,-486.17 plus costs of $10,772.25. The Court reserved decision at that time, however, on the balance of Abramson's fee request pending a hearing on the Debtor and the Committee objections to an amended proof of secured claim that had been filed by Dechert on July 26, 1996. An evidentiary hearing on those objections was held on November 27, 1996, and IPCO, the Committee, Abramson, and Dechert have all filed legal memoranda in support of their respective positions as to the appropriate distribution of the balance of the fund on hand. The matter is thus ripe for disposition.

***Discussion.***

### A. *The Dechert Claim.*

Dechert asserts no less than four separate bases in support of its claim of entitlement to a discrete portion of the settlement fund in question. The Court has considered all of these and rejects each of them. Dechert's claim to a share of the fund in question, beyond that to which it is entitled as a general unsecured creditor, will accordingly be denied.

### I. *Attorneys Charging Lien*

The issue to which all of the parties devote the most energy is Dechert's claim to an attorney's charging lien. Underlying state law in this area is well settled. For a lawyer to assert a charging lien, all of the following five factors must be present:

(1) that there is a fund in court or otherwise applicable for distribution on equitable principles,

(2) that the services of the attorney operated substantially or primarily to se-

cure the fund out of which he seeks to be paid.

(3) that it was agreed that counsel look to the fund rather than the client for his compensation,

(4) that the lien claim is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised, and

(5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

In varying degrees, Dechert fails to meet four of the above tests. The only test it can satisfy without equivocation is number 1, for it is undeniable that there is a fund in Court applicable for distribution. Factor 2, however, is that the services of the claimant attorney, here Dechert, operated substantially or primarily to secure the fund out of which payment is sought. The Court cannot say that is true here. It is perhaps accurate to say that Dechert set in motion a chain of events that led to the litigation settlement approved by this Court, and it is agreed furthermore that certain work performed by Dechert ultimately proved to be of value to Abramson. In the end, however, the Court finds Dechert's contribution to creation of the settlement fund indirect and entirely too attenuated to be considered either the primary, or substantial procuring cause thereof.

Dechert services in the main centered around the equitable relief aspects of the 1990 Common Pleas Court law suit. Its investigatory work in conjunction with the initial state court suit led it, in caution, to file the second state court action, and the same investigatory work appears ultimately to have been useful to Abramson in developing that case and preparing it for trial. It is clear, however, both from the testimony adduced at the hearings of October 7, 1996 and November 27, 1996, as well as from Dechert's legal bills themselves, that the bulk of Dechert's services related to the first lawsuit and, in particular, to the injunctive and landlord/tenant aspects thereof. No significant amount of legal work was performed by Dechert on the second lawsuit beyond the filing of the complaint. In contrast, Abramson recorded approximately $200,000 in time

charges after taking over in 1993 what was by that time the basically dormant second Common Pleas Court lawsuit. Dechert is correct, no doubt, that neither IPCO's change of counsel nor the passage of time involved between the termination of Dechert's representation and the production of the fund in question, preclude Dechert's successful assertion of an attorneys lien here, at least not automatically. These factors are not irrelevancies however. They, coupled with the documentary and testimonial evidence concerning the issue at hand, leave the Court with a clear sense that Dechert's services cannot be said to be either the primary or substantial cause of the settlement in question, at least not as those two terms are commonly understood.

■ Dechert founders as well on the requirement that the firm show that it agreed to "look to the fund rather than the client" for its compensation. In this respect Dechert insists that the language in paragraph 5 of the three way agreement (Exhibit D–5) suffices as an expression of Dechert's intention to waive any further recourse against IPCO if the Pier 80 litigation were to fail. It is difficult to accept this reading. The Debtor and the Committee note that the paragraph in question more readily implies only a forbearance by Dechert until the outcome of IPCO's litigation was known, with further collection efforts to follow if necessary. The Court agrees. Such an interpretation is fully supported by the plain text of the agreement including, in particular, Dechert's use of the temporal term "now" in paragraph 5. Dechert's attempt to vary the plain meaning of the agreement via Magaziner's testimony regarding his conversations with a principal of IPCO is barred by the parol evidence rule. Even if one were to accept that there is a latent ambiguity present in the document, however, as the drafter of the document any such ambiguity must be construed against Dechert. *Huff v. Nationwide Insurance Company,* 167 B.R. 53 (W.D.Pa. 1992), aff'd. 989 F.2d 487 (3d Cir.1993).

The fourth factor which must be met to establish a charging lien is akin to the second. The attorney must show that the lien claim is limited to fees incurred in the litiga-

tion by which the fund was raised. As with the second factor, Dechert adopts a broad view of the world and sees the subject settlement as simply being the fruit of its earlier labors. Dechert's labors were diverse, however, and it is abundantly clear from its own bills that many services were rendered which cannot reasonably be related directly to producing the litigation fund in court. Dechert's failure herein to draw any distinction in the multitude of services described in its bills is consistent with its view that in an indirect way the monetary settlement can be traced back to Dechert's initiative. Once again, in a way, it does. While, "all roads lead to Rome" such logic does not suffice for purposes of an equitable charging lien, and the Court concludes that Dechert has failed to satisfy this test, save for (probably) a modest portion of its outstanding bill.

■ The fifth requirement for the assertion of a charging lien is that equitable considerations necessitate its recognition. The difficulty with this requirement in the present case is that no party here is in sole possession of the equities. Dechert is no doubt correct that but for the grant of relief here, its ability to collect its legal fee from a client for which it clearly devoted considerable time, is put in jeopardy. The Debtor and the Committee urge, however, that Dechert's entitlement is undermined by virtue of the apparent readiness on its part to drop the case, or at least shift any remaining risks, once the going got tough. There is, too, the Bankruptcy Code policy of equality of distribution among similarly situated creditors to consider. In this regard, although it is true that attorney charging liens have been upheld in Bankruptcy proceedings, *see e.g., In re Sacerdote*, 74 B.R. 487 (Bankr.E.D.Pa. 1987), it seems only appropriate to strictly scrutinize such requests since they do perforce occasion a departure from the general policy of the Bankruptcy Code. Applying that level of scrutiny to Dechert's claim, and noting as it has that Dechert's services in may respects had only an indirect and/or tangential bearing to creation of the instant fund, the Court fails to find that the equities tip in favor of awarding Dechert an equitable charging lien.

## II. *Common Fund Doctrine*

■ Analysis of Dechert's claim under the "common fund doctrine" is largely analogous to the above discussion of an attorneys charging lien. Both Dechert and the Committee cite to the Court the following description of the doctrine found in *In re Second Pennsylvania Real Estate Corp.* 192 B.R. 663, 666 (Bankr.W.D.Pa.1995):

> The common fund doctrine was recognized by the Supreme Court *in Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (citations omitted) as providing that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.

> \*   \*   \*   \*   \*   \*

> The common fund doctrine is rooted in the principle that those who would obtain a benefit from litigation without contributing to the cost would be unjustly enriched.... It is designed to spread the costs proportionately so that the active beneficiary does not bear the whole burden while the 'stranger' beneficiaries receive benefits without bearing any of the costs.

Although the parties disagree over whether the common fund doctrine has applicability at all in circumstances where, as here, the fund in question has been recovered by one attorney after another attorney has withdrawn from the client's representation, there is no need to belabor that issue for Dechert's common fund claim fails on other grounds. There is, most significantly, the fundamental problem, already discussed, of tying the services which underlie Dechert's large $226,513.83 claim to production of the fund in question. Contrary to Dechert's charge that the creditors of IPCO will be unjustly enriched by denying Dechert its own carved out share of the settlement fund, it seems more fair to say that it would be Dechert that is unjustly enriched in the alternative. As previously noted, Dechert's bills reflect time charges over a number of years. No attempt has been made by Dechert to tie any particular group of services *specifically* to the 1992 common pleas court litigation. Rather, Dec-

hert simply insists that all of its services contributed in equal measure with (and perhaps had greater impact than) those of Abramson. This argument borders on being disingenuous. At a minimum, it certainly is unsupported by the record before the Court. Any benefits derived from Dechert's services, *vis a vis*, the 1992 lawsuit clearly cannot be "accurately traced," on the instant record nor can the attendant portion of its fee be shifted with "exactitude." Its claim insofar as it is predicated on the common fund theory must therefore fail.

### III. *Administrative Expense*

■ Dechert next claims that its unpaid bill is entitled to administrative expense status because the tri-party agreement (Exhibit D–5) was an "executory agreement" within the meaning of Section 365(b) of the Bankruptcy Code. In this regard, Dechert argues that IPCO implicitly affirmed the agreement by failing to affirmatively reject it before the underlying lawsuit was settled. This argument must be viewed as being either imaginative or an act of desperation. In either event, it lacks any merit. The Third Circuit adheres to the "Countrymen" definition of an executory agreement.[1] Under the Countryman test for an agreement to be executory material obligations must remain unperformed by the parties to the agreement. As hereinbefore noted, Dechert contends that in executing the tri-party agreement which is Exhibit D–5, it relinquished any further right to pursue IPCO for the legal fees in question. Under this view of the world there clearly is nothing material remaining for Dechert to "perform" under the agreement. Dechert argues in response, however, that its continuing obligation to refrain from initiating collection activity against IPCO for its unpaid fees is a material unperformed obligation on its part. In other words, Dechert contends that "doing nothing" is the remaining materi-

al unperformed obligation on its part. The Court finds this argument, although original, unpersuasive. Indeed, if one were to accept this proposition, it is difficult to imagine any type of fully performed agreement which the participants could not characterize as executory merely by reference to their continuing obligations to abide by the agreement's terms. The Court notes, too, that Dechert's executory contract argument is likewise at variance with its "assignment of proceeds" argument discussed *infra*. That is to say, as the Committee does, that if a portion of the litigation proceeds have been assigned to Dechert, then the tri-party agreement as to Dechert is hardly executory. For the foregoing reasons Dechert's administrative expense claim is rejected.

### IV. *Assignment of Litigation Proceeds.*

■ Dechert's final argument is that the relevant portion of the litigation fund is not even a part of the instant Bankruptcy estate because the terms of the tri-party agreement effectuated an enforceable prepetition assignment to Dechert of IPCO's interest in any future proceeds from the lawsuit, after payment of Abramson's fee, but to the full extent of Dechert's bill. The Court disagrees with the initial proposition that if Dechert's assignment argument were accepted the funds in question would not fall within the extremely broad scope of "property of the estate" as that phrase has been clarified in legislative history and construed by the Supreme Court.[2] It is true, of course, that only the Debtor's interest in the property in question at the time a Bankruptcy case is commenced becomes estate property. The extent of the Debtor's interest must in turn be determined via underlying state law.[3] Causes of action such as the 1992 Common Pleas action pending at the time of IPCO's bankruptcy filing, however, clearly fall within

1. An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either party to complete performance would constitute a material breach excusing performance of the other. *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir.1989).

2. H.R. Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977); *see also* S. Rep. No. 989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. and Admin. News, 5787, 6136–6137, 5868–5869; *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983).

3. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

the definition of property of the estate. *In re Smith* 640 F.2d 888, 3 CBC 2d 827 (7th Cir.1981). As to such causes of action the Court notes, in turn, that underlying Pennsylvania law permits a plaintiff to assign all or part of his interest in the future proceeds of a pending lawsuit. Thus, to the extent such a valid pre-petition assignment is found to exist at the time of a Bankruptcy filing, the debtor will have only bare legal title to the assigned portion, with all equitable attributes of the recovery belonging thereafter to the assignee. *In re Duty,* 78 B.R. 111 (Bankr. E.D.Va.1987); *Matter of Armando Gerstel, Inc.,* 43 B.R. 925 (Bankr.S.D.Fla. 1984) aff'd. in part; rev in part; 65 B.R. 602 (S.D.Fla.1986); *In re Petry,* 66 B.R. 61 (Bankr.N.D.Ohio 1986).

▆▆▆ There are two types of assignments recognized under Pennsylvania law— legal assignments and equitable assignments. A legal assignment is a transfer or setting over of property, or some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, chattel or other thing. *In Re Purman's Estate,* 358 Pa. 187, 56 A.2d 86 (1948). A party that cannot demonstrate a legal assignment may nevertheless invoke the doctrine of equitable assignment, which is any order, writing or act by the assignor which makes an absolute appropriation of a chose in action or fund to the use of the assignee with the intention to transfer a present interest, although not amounting to a legal assignment. *Id.* Both of the foregoing must be distinguished, however, from acts which fall short of the requisite legal standard. Specifically, a mere promise to appropriate an anticipated fund in discharge of an obligation, and no more, does not amount to an assignment, legal or equitable.[4] Unfortunately, for Dechert this is the most which the Court discerns on the record before it. The prefatory language in Paragraph 5 of the tri-party agreement does not equate with an unconditional transfer of a property interest by IPCO. It speaks only of the means for

payment of a debt. Similarly, the language of Paragraphs 6 and 7 clearly imply that IPCO retains ownership of the share of the litigation fund to which Dechert lays claim, notwithstanding IPCO's agreement to pay Dechert from such share. The precedents hereinbefore cited make plain that such a promise of payment does not rise to the level of an assignment.

In short, the Court has determined after careful consideration that in the instant case a valid pre-petition assignment of the litigation proceeds does not exist. This conclusion follows from a reading of the plain text of the tri-party agreement itself, which makes clear that IPCO neither intended to, nor did in fact, completely divest itself of all interest in a future recovery from the 1992 Common Pleas Court lawsuit. Dechert is correct that the absence of special terms of art, such as use of the word assignment itself, is not fatal to its cause. Rather, it is sufficient that the intent of the parties to effect a complete present assignment appears from the evidence *Lerman v. Joyce Int'l Inc.,* 10 F.3d 106, 112 (3d Cir.1993). Unfortunately, the Court cannot say that such evidence appears here. Accordingly, Dechert's claim as based on this theory must be denied.

### B. *Abramson's Fee*

The foregoing determination renders unnecessary any extended analysis of Abramson's fee request. The Committee's objection to the contingent fee, as noted, is only to the extent that, when added to any award to Dechert, the total attorney's fee exceeds the 40% cap stated in the retention application. This objection now becomes moot. The Court is constrained to note, however, that the Committee's objection to the parties' non-timely disclosure of Dechert's position in this matter is clearly well taken. Regardless of whether Abramson agreed or disagreed with Dechert's position as to the potential future litigation proceeds, his awareness of the tri-party agreement surely invested him with the duty to reveal its existence to the Court and the Committee as part of the

---

4. *Arkwright Mut. Ins. Co. v. Bargain City, U.S.A., Inc.,* (E.D.Pa.1966) 251 F.Supp. 221, *aff'd* (C.A.3 Pa.) 373 F.2d 701, *cert. den.* 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79; *In re Berringer* (Bankr. W.D.Pa.1991) 125 B.R. 444; *In re Coughlin* (Bankr.W.D.Pa.1985) 48 B.R. 191, 12 CBC.2d 708; *In re Lease–A–Fleet, Inc.* 141 B.R. 853 (Bankr.E.D.Pa.1992).

special counsel retention application. The same applies equally, if not more so, to IPCO, which appears to have refrained even from discussing the agreement with its own Bankruptcy counsel prior to submission of the application to retain special counsel. A different outcome as to Dechert's claim may well have occasioned consequences on this point. As it is, Abramson's contingent fee will be approved as requested, since on the record before it the Court finds the requested fee both reasonable and consistent with the contingent fee agreement previously approved. The Court further finds no basis to deem the previously approved fee improvident in light of subsequent developments. *In re Reimers*, 972 F.2d 1127, 1128 (9th Cir.1992).

An appropriate Order consistent with the foregoing will be entered herewith.

### ORDER

**AND NOW**, this 27th day of January 1997, for the reasons more fully stated in the within Opinion, it is hereby:

**ORDERED**, that the *Application of Special Counsel for Debtor for Allowance of Compensation in accordance with this Court's Order of May 10, 1996* be and hereby is Approved in the amount requested; and it is further:

**ORDERED**, that the Objection of the Debtor, and the Official Committee of Unsecured Creditors, to the Amended Proof of Claim filed by the law firm of Dechert Price & Rhoads be and hereby is sustained. The claim of Dechert Price & Rhoads is disallowed as a secured and/or priority claim. The said claim is allowed, however, as a general unsecured non-priority claim in the filed amount of $226,513.83.