**In the Matter of INDEPENDENT PIER COMPANY, Debtor.**

**In re DECHERT PRICE & RHOADS, Appellant.**

**Bankruptcy No. 96–12038–SR.**
**No. 97–CV–1632.**

United States District Court,
E.D. Pennsylvania.

June 27, 1997.

262

John A. Wetzel, John T. Carroll, III, Swartz, Campbell & Detweiler, Philadelphia, PA, for Independent Pier Co.

Christopher D. Loizides, Dechert, Price & Rhoades, Philadelphia, PA, for Dechert, Price & Rhoades.

Walter Weir, Jr., Weir & Partners, Philadelphia, PA, for Gilbert Abramson.

Bruce Grohsgal, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, PA, for Official Committee of Unsecured Creditors.

Frederic J. Baker, pro se.

## MEMORANDUM

RENDELL, District Judge.

### BACKGROUND

This matter is before me as a result of the appeal by Dechert Price & Rhoads ("Dechert") of the bankruptcy court's order sustaining objections to Dechert's proof of claim. Dechert had claimed an attorney's charging lien in the amount of $226,513.83 against a fund created upon the settlement, in 1996, of litigation originally initiated by the debtor with Dechert as its counsel, but pursued for three years prior to settlement by Gilbert Abramson, Esquire ("Abramson"). The

bankruptcy court rejected Dechert's claim of a charging lien, determining that Dechert had failed to meet four of the five requirements for establishment of the lien. Based on the record, and giving due deference to the bankruptcy judge's ability to observe and judge the witnesses before him, I will AFFIRM.[1]

The bankruptcy judge's opinion contains an accurate statement of the law relating to charging liens. The parties do not dispute the law, only the application of the law to the facts of this case. The bankruptcy judge's opinion also contains a thorough review of the facts, which I will review in skeletal fashion only to provide context for the rest of this opinion.

Dechert represented Independent Pier Company ("IPCO" or "Debtor") commencing in 1990 when IPCO desired to challenge the loss of its lease for Pier 80 at the Philadelphia port, due to the decision of the Port Corporation and Port Authority to negotiate a lease with a new competing stevedoring company, J.H. Stevedoring Company ("JHS"), instead. The chief executive officer of JHS, Jack Riemer, had been the general manager and director of IPCO, but had started a competing business, JHS. IPCO brought suit in the Philadelphia Court of Common Pleas against Riemer, JHS, and the two port entities, seeking an injunction, equitable relief, and damages, based on misappropriation, unfair competition, tortious interference, conversion, breach of fiduciary duty, and fraud.

At the same time, Dechert commenced litigation on behalf of IPCO before other tribunals arising out of the same set of facts. In October of 1991, IPCO reached a monetary settlement with the two port entities. In March of 1992, IPCO dismissed its first complaint and filed a new complaint, restating its claims, adding new parties, namely, Penn Trucking & Warehousing, Inc., and John Brown Jr. and John Brown Sr., and stating claims of inducement, aiding and abetting and conspiracy among the various defendants. IPCO had paid certain of the legal bills submitted by Dechert for the services it had rendered, but in 1993, there was a balance due and owing of over $220,000, and Dechert was not inclined to pursue the litigation without payment. Dechert contacted Abramson, who was willing to take on the litigation in the Court of Common Pleas on a contingent fee basis. Dechert provided Abramson with its extensive file and IPCO entered into an agreement whereby Dechert agreed that instead of pursuing a claim against IPCO at that time for the outstanding fee balance, it would be paid the fees from the litigation proceeds. Abramson pursued the case for three years, and, after the debtor filed for relief under chapter 11 in March of 1996, the matter was scheduled for trial (for the third time) and Abramson was able to settle the case for $1.1 million. Dechert filed a secured proof of claim seeking to be paid the $226,513.83 from the proceeds of the settlement as a "charging lien," and the Debtor and the Unsecured Creditors Committee filed objections, which the bankruptcy court upheld.

---

1. "[I]n bankruptcy cases, the district court sits as an appellate court." *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir.1995). "As a proceeding tried initially before the Bankruptcy Court for the Eastern District of Pennsylvania, the standard of review for the district court is governed by Rule 8013." *Id.* Federal Bankruptcy Rule of Civil Procedure 8013 provides:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Fed.Bankr.R.Civ.P. 8013.

The district court applies a "clearly erroneous standard to findings of fact ... [and] a de novo standard of review to questions of law." *Berkery v. Commissioner*, 192 B.R. 835, 837 (E.D.Pa. 1996), *aff'd*, 111 F.3d 125 (3d Cir.1997). "Findings of fact by a trial court are clearly erroneous when, after reviewing the evidence, the appellate court is left with the definite and firm conviction that a mistake has been committed." *In re Cohn*, 54 F.3d at 1113; *Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 44 (E.D.Pa.1996); *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir. 1981).

DISCUSSION

The elements of an attorney's charging lien have been set forth by the Pennsylvania Supreme Court in *Recht v. Urban Redevelopment Auth. of Clairton*, 402 Pa. 599, 168 A.2d 134, 138–39 (1961):

> Before a charging lien will be recognized and applied, it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised, and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

Factors (2) through (5) were addressed and found lacking in the court below, and are the subject of this appeal. I will address these factors in turn.

1. *Did the services of Dechert operate substantially or primarily to secure the fund out of which Dechert seeks to be paid?*

■ In arriving at an answer to this question, we must first explore the concept of "substantially or primarily secure the fund," and then examine the facts of this case, including the nature of Dechert's representation of the debtor and the connection that Dechert's services played in the production of the fund in question.[2]

The Pennsylvania Supreme Court in *Recht* noted the extensive case law in Pennsylvania in which the courts have discussed the attorney's charging lien. The language employed by the Pennsylvania courts in describing this type of lien provides some insight into the nature of the services and the relationship they must bear to the procurement of the fund. In *Turtle Creek Bank & Trust Co. v. Murdock*, the Superior Court of Pennsylvania noted that "A court will endeavor to protect attorneys who claim fees *from a fund created largely, if not entirely, by their efforts....*" 150 Pa.Super. 277, 28 A.2d 320, 322 (1942) (emphasis added). In the *Appeal of Harris*, the court noted that it based its decision recognizing the charging lien upon the fact that *"the professional efforts of [the] attorney produced, to a substantial extent, the fund for distribution ..."* 323 Pa. 124, 186 A. 92, 99 (1936).

■ The cases do not talk in terms of attorneys' having assisted, or provided valuable services, or contributed in some measure, but rather, they concentrate on the extent to which the attorney's skill and services actually produced the fund. The services must have substantially, primarily, largely, to a substantial extent, if not exclusively or entirely, procured or generated the fund itself. It is as to this dual aspect of the existence of, and the extent of, cause and effect that the bankruptcy judge and I, on one hand, part ways with Dechert, on the other. As noted by the bankruptcy judge, Dechert "set in motion a chain of events" and performed work that was "of value," but its contribution to the creation of the fund was "indirect and entirely too attenuated" to be the primary or substantial procuring cause. (Opinion, 209 B.R. 333, 338). I agree that while Dechert may have started the case on the track that ultimately led to the result, it had little if any role in producing the result. I find no clear error in the bankruptcy court's assessment of either the nature of the services provided or their relationship, or lack thereof, to the result achieved.

■ While Dechert is correct that more than one firm can be entitled to a charging lien, each such firm must demonstrate that its services substantially and primarily contributed to the creation of the fund. *Novinger v. E.I. DuPont de Nemours & Co., Inc.,* 809 F.2d 212, 219 (3d Cir.1987) (noting that record evidence as to whether services rendered three years before "substantially con-

---

**2.** Dechert contends that the bankruptcy court committed certain factual and legal errors in its opinion regarding this issue. I will address its arguments in the context of a discussion of the legal principles involved and the record before me; regardless of the Appellant's characterization, I find no error of either fact or law in the court's ruling on this issue.

tributed to the fund" was lacking), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).[3] Dechert's legal services in filing the complaint in 1992, and in performing certain work relating to these claims before and after filing it, obviously dealt with and advanced the subject matter of the litigation that was pursued by Abramson and was ultimately successful three years after he took it over. However, the record does not support a finding that Dechert's services for which the lien is sought substantially or primarily contributed to the creation of the fund.

As noted by the bankruptcy court, the record evidence reflects Abramson's efforts, rather than Dechert's, as having created or produced the ultimate result, namely, the settlement and the fund for settlement. Several aspects of the record before the bankruptcy court bolster this finding. As noted above, Dechert filed the second complaint in March of 1992, and did very little in furtherance of claims against the private defendants. Abramson testified that little had been done in the case other than pleadings when he took it over in 1993, a year after the second complaint had been filed. (R.R. 813). Mr. Foltz—who represented the defendants in the second action—noted that this was a period of relative inactivity. (R.R. 917). While Dechert contends that it *alone* should be credited with uncovering the "key fact" in the case—the "conspiracy" of the private defendants—neither its reference to the record nor its own witness supports that contention.[4] According to Mr. Magaziner of Dechert, the claims were asserted against the Browns because it was learned that they were Riemer's "backers" and it was "risky" not to include them due to the possible running of the statute of limitations and the prospect of Riemer's having no funds. (R.R. 852).

In addition, Dechert has failed to pinpoint what exactly it did to effect or create the $1.1

million settlement fund from the private defendants. Even Dechert's references to the record and to time records of various attorneys paint the nature of Dechert's services with an exceedingly broad brush, not relating any of the attorneys' efforts to the specific claims against Riemer and the Browns, let alone relating them as causally connected to the ultimate result or the amount ultimately realized. Appellants' brief notes activities referred to in passing in several pages of the billing statements included in the record, with no specific tie-in to the claims of the complaint or the result achieved. (Appellant's Brief, p. 9, p. 24). The brief characterizes these isolated activities as "making significant headway," the conduct of "significant discovery," and as having "formulated and refined legal theories" and "focused the case on the strongest claims against the private parties." (Brief, p. 24; R.R. 844–5, 849–51, 927). These glowing assessments are not borne out by any detailed description of the services they actually performed that purportedly resulted in the recovery of $1.1 million for the debtor's estate. By contrast, there is evidence as to Abramson's role in creating the fund. Support for the conclusion that Abramson, and not Dechert, obtained the $1.1 million result exists in the fact that the last settlement discussions while Dechert was involved (which took place in March or April of 1991) revolved around a $300,000 demand, while Abramson's later settlement demand was $5 million. (R.R. 919–920). The offer from defendants had been zero before Abramson took over. (R.R. 806). Further, the description of the specific discovery, investigatory and expert, efforts in pretrial and trial preparation activities of Abramson, as outlined in his fee application, reflects a classic recitation of extensive attorney litigation services culminating in trial and/or settlement, whereas Dechert's time records and its own summaries of activity reflect a few initial stabs at discovery. (R.R. 102–108). I therefore conclude that the

---

**3.** Dechert relies on *Novinger* for the proposition that more than one attorney may have a charging lien. The case does not stand for that proposition, but merely noted that the lower court, in refusing to recognize any claimed liens, failed to have the attorneys make a record as to whether a substantial contribution had in fact been made.

**4.** The transcript at the pages noted does not refer to any discovery of any "conspiracy" or even refer to Penn Trucking or the Browns. (R.R. 844–45, 852).

bankruptcy judge did not err in his factual determinations or legal findings with respect to this issue.

### 2. *Was it agreed that counsel was to look to the fund rather than to the client for payment?*

■ Dechert argues that its agreement with IPCO could not be clearer and that Dechert was to look solely to the fund for payment. The bankruptcy court found the meaning of the agreement clear as well, but found that it clearly permitted Dechert to sue IPCO later for its fee if it was not paid from the litigation proceeds. I find that I need only determine whether the agreement reflects an understanding that Dechert would look *solely* to the fund—or to the fund *rather than* to the client—for payment. This is the requisite inquiry as outlined in *Recht,* derived from the Pennsylvania case law. *See Recht,* 168 A.2d at 139. An examination of the agreement reveals that it contains no words of limitation, waiver or exclusivity as to whom Dechert could look to for payment of its fees. Lacking such language—which should be clearly stated if it is an effective waiver of such a right—this element of an attorney's charging lien is missing.[5] There is no ambiguity in the agreement but, rather, a complete failure to include in the agreement a provision which is required for a charging lien to exist.

■ Dechert argues that the court improperly excluded certain testimony that would have resolved any ambiguity in the agreement, and also erred in stating that the document should be construed against the drafter. The bankruptcy judge, however, found the meaning of the agreement to be clear and quite plain, as I do. It clearly and plainly says nothing regarding waiver of further recourse and it is not ambiguous in this regard. Testimony as to its meaning was therefore not necessary or appropriate. *In*

*re St. Mary Hospital,* 117 B.R. 125, 132 (Bankr.E.D.Pa.1990) ("An unambiguous contract must be interpreted as it is written, even if the parties meant or interpreted it differently."). Further, the court's offhand reference to rules of construction was *dicta,* not essential to its ruling, since, as the court noted, the meaning of the agreement is in fact clear.

### 3. *Elements (4) and (5) outlined in Recht need not be addressed.*

Dechert argues that the fourth and fifth elements under *Recht*—namely, the extent of the lien and the presence of equitable considerations—have been met. Since I concur with the bankruptcy judge that no charging lien exists in light of the absence of the second and third factors, as noted above, and since all of the factors must be met in order for a lien to have arisen in Dechert's favor, I need not address these last two factors. *Recht,* 168 A.2d at 138–39 (listing the five factors that must be present in order for the charging lien to exist)

Accordingly, the order of the bankruptcy judge sustaining the objections to Dechert's secured proof of claim is AFFIRMED.

---

**5.** It should be noted that in this sense a charging lien is different from another lien or secured claim; the obligee gives up the right to look to the obligor and is bound to look *solely* to the collateral—the litigation proceeds—for payment. In that this involves a waiver of rights, it must be clearly stated. *See Chassen v. United States,* 207 F.2d 83, 84 n. 3 (2d Cir.1953), *cert. denied,* 346 U.S. 923, 74 S.Ct. 309, 98 L.Ed. 416 (1954) (finding that there could be no waiver in the absence of intentional relinquishment of a known right); *Tookmanian v. Safe Harbor Water Power Corp.,* 505 F.Supp. 920, 923 (E.D.Pa.1981) (waiver of rights must be knowingly and intelligently made).